## COURT OF APPEALS, JUNE TERM, 1797.

### B. & T. C. HOWARD *vs.* WARFIELD's Administrator.

THIS was an appeal from a decree of the court of chancery. The bill which was filed by the present appellee on the 7th of October, 1794, states, that *Azel Warfield*, father of the complainant, died intestate many years since, leaving debts due on unsettled accounts to and from him, and the administration of his personal estate was in due form of law committed to the complainant. That a certain *Joseph Howard* deceased, *Rachel* his widow, (who has since intermarried with *Joseph Beall*) *Thomas Cornelius Howard*, *Brice Howard* and *Joseph Howard*, were respectively indebted to the said *Azel* in his lifetime, in certain sums of money, as by the accounts exhibited, Nos. 1, 2, 3, 4, 5 and 6, appears. That the said *Brice* and *Thomas C.* surviving partners of *Brice*, *Thomas C*, and *Joseph*, three of the persons above named, exhibited a claim against the said *Azel* for sundry dealings and articles between the years 1773 and 1778, and commenced suit thereon against the complainant as administrator of the said *Azel*, to recover the balance alleged to be due on the said claim, to which said suit the complainant appeared; and as the plaintiffs were reluctant to allow the several accounts aforesaid to be discounted and set off against their claim, (although each of the persons so indebted to the said *Azel* was concerned in interest in the claim on which suit was brought, as the complainant believes he can readily make appear) he therefore directed his attorney to plead and rely on the statute of limitations, and to set up the above claims in bar, which was done. That on the morning of the trial of the cause, the plaintiffs' counsel made a proposition of a general reference of the said cause, to which the complainant, with the advice of his counsel, dissented; but proposed that if all legal objections should be waved to the accounts which he set up in bar, and the equity and justice of the case, on a view and

June, 1797.

Howards
vs.
Warfield's
administrator.

examination of all the accounts, were alone to be regarded, he would, under such restrictions, agree to a reference; and the complainant accordingly assented to a special reference, couched in terms calculated expressly to introduce all his accounts in bar if just, and without which he never would have waved the benefit of the act of limitations.

That when the complainant and *Brice Howard* appeared before the referees, the said *Brice* acknowledged all the accounts exhibited by the complainant to be just and true. That the referees examined each of the exhibits Nos. 1, &c. and although they state that they appear all just, yet they refused to allow or discount several of them, mistaking and misconceiving the nature and extent of the terms of reference; and under such mistake awarded a large sum of money against the complainant, although in truth a balance was due to the complainant; and as each of the persons named in the claims and exhibits Nos. 1, &c. were interested in the account on which suit was brought against the complainant, it was intended by the terms of the reference that such claims, if just, (and so the referees have set forth) should be allowed. That the complainant's counsel omitted to prevent judgment being entered on the award, and it passed *sub silentio;* but being advised that the court of appeals would rectify an error or mistake existing or apparent on the face of the award and record, the complainant removed the said cause to the court of appeals, where from the indisposition of his counsel, or other cause unknown to the complainant, the judgment was affirmed without argument or opposition. And the plaintiffs in such judgment have issued a *fieri facias* against the goods and chattels of the said *Azel,* in the hands of the complainant, and threaten to proceed to sale, although one of the exhibits, admitted to be just by the referees, contains a considerable claim against one of the plaintiffs who hath issued the execution, and which, contrary to all equity, and in violation of the terms of the reference, hath not been deducted or credited.

That the complainant, in hopes he could recover some of the claims not credited or allowed by the referees, brought suit against *Joseph Beall,* and wife, administrators of *Joseph Howard,* on the account No. 1, which was laid before the referees; whereupon the defendants entered into an agreement, which was to vest in the complainant the amount of his claim when the said defendants should recover the same, on a suit depending in the court of chancery brought by them against those very persons who have issued the *fieri facias* against the

complainant; which proves the very money to be levied
is to be applied to those who are indebted to the com-
plainant, and whose debt in the first instance ought to
have been allowed to the complainant as a discount un-
der the terms of reference;—and the complainant well
hoped that the defendants, *Brice* and *Thomas C. Howard,*
knowing of the assignment from *Beall* to him, and
knowing of the mistake and misconstruction of the re-
ferees in their award, and knowing the said *Thomas C.*
to be largely indebted in an account to the complainant,
acknowledged to be just, that they would have desisted
from issuing a *fieri facias*—But now so it is, &c.

The ANSWER of *Brice Howard.* That *Joseph Howard,*
deceased, and the defendants, carried on, as joint part-
ners, a mercantile connexion for several years in buying
and selling merchandize, and that during the course of
their co-partnership the said *Azel* purchased of the said
company goods, &c. to a considerable amount, for which
he was indebted at the time of his death. That the said
*Azel* for many years before his death carried on the bu-
siness of, &c. and during that period did work, &c. for
*Joseph Howard* and company, (consisting of the defen-
dants and *Joseph Howard* deceased) who carried on a
plantation for their joint advantage, to the amount of
the exhibit No. 5. That after the death of the said *Jo-
seph,* which happened in 1777, the said plantation was
carried on by *Rachel* (the widow of the said *Joseph)*
and the defendants, for their joint benefit; during which
period the said *Azel* did work, &c. for them to the
amount of exhibit No. 4. That the said *Azel* in his life
time, did also sundry work, &c. for the said *Brice,* as
specified in the exhibit No. 6, for which the said *Brice*
was willing that the said *Azel* should be credited in his
account with the company, consisting of the said *Joseph*
and the defendants. That the several accounts specified
in the complainant's exhibits Nos. 1, 2 and 3, were not
contracted on the copartnership account, and this defen-
dant knows not whether the same be just or otherwise;
and if they are just, this defendant contends the com-
plainant has his remedy for recovery thereof against the
executors of the said *Joseph,* against the said *Rachel,* who
hath intermarried with *Joseph Beall,* and against the
said *Thomas C. Howard;* all of whom are in solvent cir-
cumstances, and fully capable of discharging any just
claim against them.

That finding no mode of settlement could be obtained
with the complainant, without blending various accounts
in the adjustment thereof, which the complainant unrea-
sonably insisted should be accounted for by the compa-
ny, and which they were not accountable for, being in

June, 1797.

Howards
vs.
Warfield's
administrator.

no wise as a company interested therein, this de-
fendant was obliged to bring suit for recovery of
the said claim; which suit after various continu-
ances, was referred, the terms of which fully as-
certain and specify upon what conditions the said refer-
ence was entered into. That when the said reference
was assented to, and entered into by the parties, it was
intended, and so expressed, that the arbitrators should
be confined to no other transactions but those which had
arisen between the said *Azel* and the company. That
the defendant was not induced to consent to a reference
with the complainant because he had pleaded the statute
of limitations, for he was provided with testimony at the
trial to prove the acknowledgment and assumption of
the said *Azel*, some short time before his death, as to the
justice of the claims for which suit was brought against
the complainant. That he, this defendant, made no ad-
mission respecting the justice of the accounts in the ex-
hibits Nos. 1, 2 and 3; on the contrary this defendant
always refused to discount the same out of the co-part-
nership claim for which the complainant had been sued.
That in the opinion of this defendant the arbitrators
did not mistake or misconceive the nature and extent of
the terms of reference entered into, as the same were
canvassed over between the complainant and this defen-
dant, in presence of the arbitrators. That this defen-
dant consented to the reference expressly for the pur-
pose of avoiding the settlement of accounts which he,
as acting partner of the company, had nothing to do with.

That if the award given by the arbitrators was con-
trary to law, and not pursuant to the powers vested in
them, the general court had full power and authority
to set the same aside; but instead thereof judgment was
entered on the said award by the general court, and the
same was confirmed in the court of appeals, where the
said complainant had full remedy, provided his case had
admitted of relief. This defendant, therefore, doth
plead the said award, and the proceedings had thereon
at law, in bar to any inquiry or investigation of the
subject in this court. That the said *Beall* and wife have
no just claim against the defendants on account of the
copartnership, this defendant having paid the legal re-
presentatives of the said *Joseph Howard* the full propor-
tion which was due to the said *Joseph* on the said co-
partnership; but if it were otherwise, this defendant
contends, the complainant cannot avail himself thereof,
he being no party to the chancery suit referred to in
the bill of the complainant.

The ANSWER of *Thomas C. Howard*, states, that the
said *Brice*, the other defendant, always managed the

company concerns of *Joseph Howard* and the defendants, during their copartnership, and this defendant never intermeddled in any manner with the settlement of the same. That the said company had nothing to do with the private claims against the respective copartners.

That the account specified in the exhibit No. 3, against this defendant, is not just or true, and this defendant never would consent to settle the same, either with *Azel* in his life-time, or with the complainant, since his decease.

That if the complainant hath any just claim against this defendant, he is both able and willing to pay it, without having the same blended with the copartnership transactions of *Joseph Howard, & Co.* the sole management whereof is vested in the said *Brice*.

This defendant relies upon the award and judgment thereon obtained against the complainant, and pleads the same in bar to any relief in this court, the complainant having had a full hearing before the arbitrators, and their judgment being confirmed.

Exhibits. No. 1. An account against *Joseph Howard*.

No. 2. An account against *Rachel Howard*.

No. 3. An account against *Thomas Cornelius Howard*.

No. 4. An account against *Thomas C, Brice* and *Rachel Howard*.

No. 5. An account against *Howard & Company*.

No. 6. An account against *Brice Howard*.

THE TERMS of REFERENCE were, " This cause is re-" ferred to Messrs. *Thomas, Richard* and *Benjamin* " *Harwood*, arbitrators, who are to award according to " the principles of equity, and to allow all accounts " that are just, without regard to legal objections; and " on the award of them, or any two of them, judg-" ment to be entered."

THE AWARD. " Agreeably to the order of the court, we the subscribers, having taken into consideration the settlement of the accounts of the said *Thomas C. Howard* and *Brice Howard*, surviving partners of *Joseph Howard*, and *Charles Alexander Warfield*, administrator of *Azel Warfield*, are of opinion, that although the accounts exhibited against *Joseph Howard*, deceased, *Thomas C.* and *Rachel Howard*, appear to be just, cannot be deducted from the claim of *Thomas C. Howard* and *Brice Howard*, surviving partners of *Joseph Howard;* but have deducted from their claim the accounts of *Azel Warfield* against *Thomas C. Howard, Brice Howard*, and *Rachel Howard*, Messrs. *Howard & Company* and *Brice Howard*, and find that the said *Charles A. Warfield*, administrator as aforesaid, is indebted to the said *Thomas C.* and *Brice Howard*, 89*l.* 8*s.* 5½*d.* principal, and the

JUNE, 1797.

Howards
v.
Warfield's
administrator.

sum of 53l. 14s. 0d. for interest thereon. And wc do therefore award, that the said *C. A. Warfield,* administrator aforesaid, pay unto the said *T. C.* and *B. Howard,* surviving partners as aforesaid, the sum of 143l. 2s. 5½d. current money, and costs of suit. In witness," &c.

AGREEMENT between the counsel for the parties, that the case be submitted to the chancellor for a final decision on the bill, answer, exhibits, and other proceedings. Also that the general court was not moved to set aside, and did not examine into the merits of the award. Also that the counsel for the complainant, as defendant at law, had notice of the return of the award in the general court.

HANSON, *Chancellor.* (February term, 1795,) THREE POINTS have been made by the defendants.

1. As there is no allegation of want of notice, or unfair or improper proceedings in the referees, the award ought to be held final and conclusive.

2d. Supposing an inquiry or examination of the award might be made on the ground of a mistake apparent on the face of it, the referees have actually made no mistake.

3d. As the award was made on a rule of the general court, to which it was returned, and in which judgment was thereon entered, and of which the power is coextensive with the power of this court, the complainant is precluded from relief by a settled principle of this court.

As to the *first point,* the chancellor is clearly of opinion, that although the course and manner of proceeding of referees be strictly proper, if there be any mistake apparent on the face of the award, it is a good ground for setting the same aside, or granting such other relief as may be best suited to the case.

As to the *second point,* the chancellor conceives it a settled point, or at least a point which ought to be settled, that when two or more men enter into partnership to which any person becomes indebted, any debts which one of the partners contracts with such person, shall be discounted, (at least in equity) from the debt due to the company. The safety of society requires such rule; as without it a man by entering into partnership, and investing his property therein, might impose on and defraud his own private creditors. Suppose A and B to be partners; C becomes indebted to them 100l. and afterwards A becomes indebted to him on his private account 100l. If C cannot discount this claim, from the partnership claim, the consequence will be this, that A will recover from him 50l. notwithstanding that A owes him double the sum. Should he afterwards bring suit against A it may turn out that A has no property

except what is vested in the partnership, and on becoming bankrupt, the property belonging to the company may be applied in the first place to the discharge of the company's debts. The establishment of such a rule is by no means injurious to the company's creditors; because they have to resort not only to the company's property, but to the property of each partner. In short, mankind would never be secure from fraud and imposition, practised under colour of partnership, if the construction of every rule or provision were not favourable to the person who contracts debt with a company.

With respect to the *last point*, although this court hath sometimes refused an *injunction* to stay proceedings at law on a judgment entered on an award made under a rule of the general court, when the injunction has been prayed, on the suggestion of improper conduct in the arbitrators; and although the reason for refusing the injunction was that the party had neglected his application to the general court, which had full power to relieve him, it by no means follows that this court would never examine an award made under a rule of reference in the general court. Whether or not an injunction shall issue depends on all the circumstances of the case. And if a man has quietly submitted a judgment to be entered against him on such an award, and hath delayed the plaintiff by carrying his cause to the court of appeals, which after a considerable lapse of time hath affirmed the judgment, it is not reasonable that he should further delay the execution by injunction, notwithstanding that on a bill filed in this court for relief against the judgment he may finally obtain relief.

It is by no means an universal rule, that wherever a man has a competent remedy at law, this court will not exercise a jurisdiction. Various are the cases where the party has his election to proceed at law or in chancery. The rule is this, that where the party hath had a fair examination of his case before a tribunal which was competent for his relief, this court will not interfere. But to say that this court will not interfere because the case might have been examined before another competent tribunal, would be to declare, that this court will not exercise a concurrent jurisdiction with any other tribunal. Besides, this court on a variety of accounts, is more proper than a court of law for examining into every thing respecting an award.

Supposing this court not to grant relief in the present case, it is plain that although the referees have declared the complainant's accounts to be just, he may be deprived of his relief at law by the defendant's refusal to have the several causes tried upon their merits. Here then is an additional reason for the court's interference.

June, 1797.

Howards
vs.
Warfield's
administrator.

As to the answer's denying the justice of the accounts, the chancellor apprehends that the rule respecting answers does not apply. There was no necessity for the defendants to declare whether or not there was a mistake on the face of the award, which speaks for itself.

It is difficult to understand the principle on which the referees decided. The true meaning of the reference appears to be this—*they shall allow all accounts which are true and just in themselves, and which are proper to be discounted from the plaintiff's claim, any legal objections to such accounts notwithstanding*. What was meant by legal objections were these—want of regular probat, operation of the act of limitations, and the like. The meaning was not, as contended for the complainant, that the referees should at all events allow the accounts he had exhibited—They were first to consider, whether those accounts were of such a kind as ought to be discounted, and, if they were of such a kind, whether or not they were true and just. The referees, in their award, have declared those accounts to be just, although they do not allow them, because they are not proper to be discounted; and herein the chancellor thinks they are mistaken in the face of the award.

But why have they allowed the account a just one against one of the surviving partners and not against the other? Why have they allowed the claim against *Brice, Thomas* and *Rachel,* to be discounted from the claim of *Thomas* and *Brice* only? An account against a different company, of which they are partners, can on no principle differ from an account against one of them only. But probably, in considering the accounts, the referees examined the interest which the several persons would have in the money when recovered from the complainant; that is to say, if *Rachel* was entitled to so much of it, when recovered, as she owed the complainant, there was no necessity for a circuity of payments; and if *Thomas C.* was not entitled to part of it, when recovered, the account against him ought not to be discounted. If that was the principle of the referees it was certainly plausible, although not satisfactory to the chancellor.

Upon the whole, it is evident to the chancellor, on the face of the award referring to the accounts, that had they allowed all the accounts proper to be allowed, nothing would have been due to the defendants; and therefore the referees would have awarded nothing; and of course the defendants would not have obtained a judgment.

It is thereupon, this 5th day of March 1795, by, &c. adjudged, &c. that the injunction heretofore issued

in this cause be and is hereby declared to be perpetual; but that each of the parties in this cause bear the legal costs expended respectively in the prosecution or defence of this suit."

THE DEFENDANTS appealed to the court of appeals; and at the last term the case was argued by *Martin* (attorney-general) and *Ridgely*, for appellants. *Key* and *Mason* for appellee.

*Ridgely* for the appellants. This is an appeal from a decree of the chancellor; which decree set aside a judgment on an award obtained in the general court, and afterwards affirmed in this court; and which decree also ordained that debts contracted with *separate individuals* of a company should be paid *out of the copartnership effects*, although no settlement of the company concerns had taken place; and also that the share of *one partner* should be applied to pay the *private debts* of *another*; nay further, that the debt of a person who was not a partner should be discounted, though *no party to the suit*.

In order that the court may comprehend this case, and give due weight to the arguments which will be urged for a reversal of this decree, I shall beg their attention while I state the facts arising in the case.

From the facts stated in the record they briefly appear as follow:

That a reference took place between the parties in the suit in the general court.

That the cause was referred to Messrs. *T. R.* and *B. Harwood*, "who are to award according to the principles of equity, and to allow all accounts that are just, without regard to legal objections."

The arbitrators, by their award, awarded 58*l.* 8*s.* 5½*d.* *principal*, and 53*l.* 14*s.* 0*d.* interest. They say, that although the accounts against *J. Howard*, deceased, *T. C. Howard*, and *Rachel Howard*, appear *to be just*, yet they cannot be deducted from the claim of *T. C. H.* and *B. H. surviving partners.*

On this award, after laying the usual time in the general court, and the defendant having notice thereof, a judgment was entered at May term 1792. From this judgment the defendant appealed, and *on the appeal, judgment was rendered by this court* in *favour of the award.*

The defendant then filed his bill in the court of chancery, and on the answers being filed, which denied the facts alleged, the chancellor has *decreed a perpetual injunction*, or in other words, he *has set aside the judgment and the award*, and allowed these *private accounts* against *the company.*

June, 1797.

Howards
vs.
Warfield's
administrator.

From this decree of the chancellor, we have applied to this court for *relief*.

Before we enter upon the merits of this dispute between the *parties upon principles of equity*, without having any regard to *the judgment rendered in the general court*, I shall contend, that the court of chancery hath *no jurisdiction* to *set aside this award and judgment* rendered *in the general court*, inasmuch as *the power and authority* of the *general court*, with regard to awards, is *coextensive* and *coequal* with the court of chancery.

That where a *court of common law, having complete powers* to decide on the merits of an award, hath exercised their judgment, a *court of chancery will not interfere*, and undertake to say, such *court of common law* hath acted wrong.

That the chancellor cannot *interpose his authority*, and give relief, *in any case* where the whole matter *hath been subject to the jurisdiction of a court of common law*, who hath given judgment thereon.

A strong circumstance, independent of authorities, to satisfy this court that the chancellor cannot interpose, consistent with the powers appertaining to a court of equity, let us refer to the language of a bill in chancery.

A bill in chancery is in the nature of a declaration at law, setting forth the facts, and *praying relief*, upon the *suggestion that the party is without remedy at common law.* 1 *Har. Ch.* 40.

The *ground* upon which a court of equity controuls a *court of common law*, arises on an allegation, *that the court of common law*, by its *rigid maxims, is incompetent to give relief*—not *that the party neglected to obtain relief.*

A fair inference may be then drawn, that if the party *complaining has remedy* at common law, the court of chancery ought not to interpose. This appears to be the true *distinction.*

It may be well to consider the consequences and confusion that would ensue, if two courts, *coextensive in their powers*, can be controuled, *the one* by the *other*, where no appeal is provided from the judgment of one to the other.

The inconveniencies would be such as to furnish strong reasons to suppose that two *coequal jurisdictions* cannot exist independent of each other in the same community.

To show that the position which I have laid down is a legal one, let us see what powers are exercised by *courts of common law* in *cases of awards*.

Before the statute of 9 *and* 10 *Wm.* 3, *c.* 15, *(2 Eq. ab.* 91, for clauses of the statute) courts were very limited in their jurisdiction respecting awards. That statute was made to give facility to this speedy and ami-

cable mode of settlement; nevertheless it provided that no process to enforce the performance of an award should be delayed by *courts of law or equity,* unless it appeared, on *oath,* that arbitrators *misbehaved,* or that the award was procured by *corruption,* or other *undue means,* and then shall be deemed void, and set aside, in any *court of law or equity.*

This act of parliament, when duly considered, must give weight to the doctrine I contend for, to wit:

That *the hearing ought to be before the court where the reference is made.*

If the reference be made in *chancery, chancery* ought to *inquire*—if the reference is at *common law,* common law *ought to inquire.*

To shew that courts of common law in this case have *all the powers* of a *court of chancery,* nay powers more extensive than any derived from the statute of *Wm. 3, ch. 15,* let us advert to our act of assembly.

By the act of assembly, *October* session 1778, *ch.* 21, *s.* 8, " If any cause instituted in any court of this state shall be referred to the award of any persons, *it* shall be lawful for such court to give judgment, and award *execution,* in the same manner as they might do upon *verdict;* and *such judgment* shall have the *same effect,* to every *intent and purpose,* as *any judgment upon verdict;* provided such award shall remain seven days in court *before judgment be entered.* And if it shall appear to the court that the award was obtained by *fraud* or *malpractice* in, or by *surprize, imposition,* or *deception* of the arbitrators, or without due *notice* to the *party,* their *attorney* or *attornies,* it shall be lawful for said court to set aside the said award." By the act of 1785, *ch.* 80, *s.* 11, a copy of the award to be delivered to the adverse party, or *his attorney,* before *judgment is moved for,* and the court shall not give judgment without proof that a copy of the award has been served on the party.

From these acts of assembly, and the formalities required by them, the law is fixed, that a *judgment* on an award shall be to *every intent and purpose* of the same effect as a *verdict;* and I shall show that a *verdict* cannot be set aside in *chancery* for any of the matters suggested in this bill.

Under the acts of assembly no judgment could be entered *without notice*—Court to inquire into fraud, &c.

I shall now advert to several authorities to show, that in England, where courts of common law have not the same extensive authority as under our acts of assembly, and where attachment only issues to enforce an award, and where it *has not* all the *conclusive qualities* of a *verdict,* a court of equity *will not interfere* after *hearing at law.*

JUNE, 1797.

Howards
vs.
Warfield's
administrator.

Courts of equity have no greater latitude than courts of common law to *determine awards*. Prayer of a bill to *set aside an award*, must be founded on *fraud, corruption*, or *misbehaviour*. 2 *Atk*. 504.

If courts of equity were to take greater latitude in *determining awards*, than *courts of law*, it would introduce confusion and *uncertainty*—it is better therefore to adhere to *one rule*.

Where a submission by rule of a *court of law*, a *court of equity* will not entertain a bill to set aside an award, even for *corruption* or *partiality*, unless court of law have refused relief. 2 *Atk*. 155. *Kyd*, 230.

The only instance of a bill in chancery on a reference and award in K. B. is *Ward's* case. *id*. The reason why the chancellor interfered in *Ward's* case, was because the judges divided in K. B. and no attachment could issue to enforce the award. It was referred to the master to know what had been in K. B. 2 *Vez*. 347.

In the case in 2 *Atkins*, 155, there was an award in K. B. The plaintiff brought his bill suggesting *fraud* and *corruption* in the arbitrators. The defendant plead the award. Per Lord chancellor, why did you not proceed in K. Bench, the proper court to examine into *partiality* or *corruption* of the arbitrators?

Bill to set aside *verdict and judgment at law* as obtained against conscience; defendant pleads verdict and judgment in bar. Plea adjudged good. 3 *Atk*. 221.

Bill to set aside award. Three causes assigned—1st Excessive damages. 2d. Misbehaviour in arbitrators. 3d. That *the repairs* for which damages were awarded *were made before award given in*. The defendant insisted that the award ought not to be set aside unless *fraud* or *partiality*; that plaintiff had *notice to attend*, but *did not*, and that umpire had *no notice of repairs* being made, and if he had, not material to *avoid the award*. Bill dismissed. 2 *Ca. Ch.* 140.

The same case in 1 *Vern*. 158, where it is said that the defendant insisted that award was made pursuant to rule of court, and that matters were examined in *common pleas*, and that there was no fraud or collusion in the arbitrators. necessary to avoid an *award* in *equity*.

When a submission is by rule of court, *equity will not relieve*, when the matter has been examined by another court that had jurisdiction, unless the *equity be* that some matter of *fraud* in the award had come to the knowledge of the party *since* the *former examination*, and which did not *appear before the court*. 2 *Eq. Ca. Ab*. 92. 3 *Vin*. 134, *pl*. 19.

The court will not permit the plaintiff to *discuss any legal objection* to the award itself, because advantages

may be taken of *them at law.* *Amb,* 245.   *Kyd,* 241.
*Lord Hardw.* 296.   1 *Stra.* 301.

Hence it must appear that the chancellor *hath exercised powers* in reversing the judgment of the general court not *warranted by law,* or by *any authority to be found in the books.*

I shall now proceed to consider this case upon *principles of equity.* independent of *any award* and *judgment* in the general court, in the same manner as if the suit between the parties had been originally instituted in the court of chancery.

I shall contend, that upon every principle which influences a court of equity, the *private* claims against *Joseph Howard.* deceased, *T. C. Howard,* and *Rachel Howard,* cannot be *discounted* or *set off* against the claim of *B.* and *T. C. Howard* the surviving partners.

I do admit that the court of chancery will *set off* and *discount mutual claims* between the *same parties,* but no instance can be produced where a demand against *one partner,* arising for articles furnished for his *private use* and *benefit.* will be discounted after *verdict* from a judgment obtained *by the company.*

For the true distinction, 8 *Viner,* 560. Intestate, who died *insolvent,* bought sugars of a company, and let one of the *partners* have paper, which was applied to the *use of the company,* and evidence was *given* of an *intention* to *discount;* the sugar was *joint stock,* and the paper applied to the use of the *joint trade,* and not for the *partner's separate* use. The administrator brought suit and recovered judgment. The Lord *Chancellor* decreed discount, because the *intestate was insolvent* and *no other remedy* left to the *company;* because the claim arose on the *joint account,* and was not *applied* to the *separate use of the partner;* because evidence of an *intention to discount* in the parties *at the time.*

Not one of the reasons which influenced Lord *Macclesfield's* opinion exist in the present case.

Accounts No. 1, 2, 3. do not contain *claims* for articles supplied the *company.* They contain claims against *J. Howard,* deceased; against *R. Howard,* the *widow,* contracted by her separately after his decease, when the *copartnership was at an end;* against *T. C. Howard* for *blacksmith's work* done for their *separate farms,* and not for *the use of company.* No evidence has been offered to show they were intended to be discounted out of the *company claims,* but strong presumptions that they *were not;* because at this very time, the testator A. W. kept a *distinct account* against *the company* for work done for *them in* company. If these accounts were intended to be settled with the company's claim

against him, why did he not charge them to the *company?* All the parties indebted by exhibits No. 1, 2 and 3, are *in good circumstances,* and able to pay. There is no allegation in the bill of their *insolvency* or *inability* to pay, or that the claims will *be lost if* not *discounted.* The complainant has his *remedy at law* against *each.*

In 1 *Eq. Ab.* 870, there were two partners, one dies, and the survivor owes *private* debts to the debtors of the company. The court ordered him to give security for *half.*

A B and C in trade, as partners; C wastes and contracts private debts, and becomes *bankrupt;* commissioners assign *company debts.* A and B brought their bill. Decreed that the *company debts* should *be first paid.* That assignees to stand in C's shoes. 1 *Eq. Ab.* 370.

An estate belonging to joint trade, to pay *joint debts,* separate creditor petitioned to be *let in,* and *it was rejected.* 1 *Eq. Ab.* 55.

The *joint creditors* are to be paid out of the *partnership effects,* and the *separate creditors* out of *separate effects;* if any surplus of the partnership effects, the *separate creditors* to come in. 2 *P. Wms.* 500.

In 1 *Vez.* 239, Lord *Hardwicke* said, if a creditor of one partner takes out execution against the partnership effects, he can only have the undivided share of his debtor, and must take it in the same manner the debtor himself had it, and subject to the rights of the other partners.

The claim of a creditor of partners *severally,* for money which came to the use of the partners, may be proved against the *joint* or *separate* fund. It is a joint debt in respect of *its having come to the joint use.* 2 *Bro. Cha.* 596. A creditor *separate* cannot *effect the stock.* 1 *Vez.* 242.

The *separate* creditors *of one partner* cannot claim against the joint stock. 3 *Bro. Cha.* 461, 462.

Joint debts are to be paid out of the joint stock, and if any *surplus* it is to be applied to *pay the particular* debts of each *partner.* 16 *Vin.* 242.

There is another objection which may be fairly urged against this decree.

There is no *mutuality* in the *discounts* contended for by the complainant and decreed by the chancellor.

The judgment is for a *company debt.* The discounts prayed for are for *private claims* against separate individuals composing the company, and one *individual* not of *the company.*

The statutes of *set off* and *discounts* only relate to mutual debts between the same parties, *plaintiff* and *defen*

*dant.* Stat. 2 *Geo.* 2, *ch.* 22, *s.* 13, recited in 8 *Vin.* 560.

Debts set off must be mutual—not a *separate* debt against a *joint one.* *Tidd's Prac.* 217.

Debts between different parties will not be permitted to be discounted. *Layer's Costs,* 207.

The court of chancery adopt the same rule as laid down by the statute. 1 *Vez.* 375.

The confusion would become endless if the doctrine of discounts, contended for by the appellee, was admitted; it would destroy every rule which courts of equity have invariably adopted in every instance, viz. That *company* property is *first* to be applied to discharge *company* debts, and *separate* property, *separate creditors,* and afterwards *partnership* creditors. 2 *Vern.* 706. 3 *P. Wms.* 125.

Suppose the concern of *J. Howard, & Co.* owed *company debts sufficient to absorb the debts* due to the company, where would be the remedy of the *company creditors* if the *stock of the company* is swallowed up by *private claims, individually* set up against the *separate partners,* arising from *their separate engagements,* and *converted to their own private purposes?* This objection cannot be got over.

What will be the consequence of this decision? That not only the *private property* of *T. C. Howard* is applied to pay *this private debt of his,* but the *effects* of the other partners are taken for that purpose.

But there is one other objection to this decree which I cannot pass over, and I call upon the counsel for the appellee to reconcile; it appears to be without precedent or example; it is a new feature in our *equitable* jurisprudence.

The chancellor has decreed, that the demand of a person, who was not a *partner of this company,* who was an *entire stranger to it,* who contracted a debt with the appellee's testator long after the copartnership was dissolved, who was *no party* to this suit, should be discounted out of it. *See Rachel Howard's account No.* 2.

Suppose the appellee's testator had sued *T. C. Howard* and *Joseph Howard,* in his life-time for these claims which the chancellor has allowed, and judgment had been obtained thereon, could a *fieri facias* have been issued so as to have taken the *company property* to satisfy this debt?

In *Cowper* 449, 450, per Lord *Mansfield,* one partner can have no right against the other but what is due from him after making all just allowances. Assignees under a commission of bankruptcy against one partner, must be in the same state.

Judgment against *one joint* partner *does not affect the other partner.* The court determined the sheriff could *not sell but a moiety.* 2 *Ld. Ray.* 871. *Salk.* 392.

If then such is the law, *that the debt of one partner* cannot be levied on the part or share of another, how can a decree say that the debt of *one partner* shall be satisfied out of the property of the *copartners?* Where did the chancellor derive his power to supersede and controul this principle of law, so conformable to justice, *that every man should pay his own debts?*

Establish this rule in chancery, and then one partner gets in debt, the creditor will apply to the court of chancery, by filing a bill, and the chancellor would decree the property of a copartner to satisfy the private debt. I wish to see some authority from adjudged cases to satisfy me on this point.

But admitting a court of equity had power of discounting or setting off against a *copartnership* debt the *separate* claims against each *individual* copartner, yet in so doing should *not the common forms be pursued?* Should not the testimony to be produced be conformable to the rules of equity?

What is the rule of equity? A bill should have all necessary parties before the court who may be affected by the demand; if it appears that any, whose interest is concerned, are not made parties thereto, the decree may be reversed. *Hinde's Prac.* 213.

All who are interested must be made parties, otherwise the decree will be reversed. 1 *Harrison's Ch.* 32.

All persons concerned in the demand, or who may be affected by the relief prayed, ought to be parties. *Mitford's Plead.* 39, 144, 224.

How does the doctrine apply to the present case? Are there not several persons affected by this decree who are not parties? The executors of *Joseph Howard* and *Rachel Howard.* No opportunity has been given to them to contest the propriety or justice of the claims which the chancellor has decreed in this *ex parte manner.*

Suppose this decree had been acquiesced in, the surviving partners would have charged *J. Howard's* share with the sum allowed. They would have charged *Rachel Howard,* the widow, with so much paid for her. But suppose she had, when applied to, answered, I have got a receipt against this account, why did not *Warfield* or his administrator apply to me for payment? It is discharged. Why not give me notice of this demand, I could have controverted it with success; I am no party to this decree; I will not be bound by it.

This would be a good justification; yet if the decree is right, *R. Howard* would be obliged to account to the

copartnership for money paid by them when she had already paid it.

No decree can be made against a man's answer. 1 *Har. Cha.* 371.

No decree can be had against a person who denies by his answer, if the cause is heard on bill and answer; the facts must be established by indifferent testimony. 1 *Vern.* 140.

What do the bill and answer say? The bill charges these accounts to be just—The answer denies them. What is the evidence produced? That they appeared to the arbitrators to be just, yet as they had no power to inquire, the parties had no opportunity to contest their justice. Yet this is admitted as *conclusive evidence.*

That the arbitrators had no power to investigate these accounts will appear by adverting to the powers committed to them under the award.

The rule of reference is, "this cause is referred to "T. H." &c. "who are to *award according to the prin-* "*ciples of equity, and to allow all accounts that are just,* "*without regard to legal objections,*" &c.

This power was *special,* and could not be exceeded; to allow all just accounts must mean *all just accounts between the parties.* Could they take any other accounts into consideration than what arose between the parties?

Suppose the appellee had brought suit against *Rachel Howard,* or *T. C. Howard,* and had offered this award in evidence to a jury to support his claim, would such evidence be admissible? could not the defendant object and say, that being no party to the suit, she was not bound by *the opinion of the arbitrators.* The same rule of evidence is in the court of chancery.

Suppose the arbitrators had awarded that *R. Howard* and *T. C. Howard* should pay the respective accounts against them in their *private capacities,* no judgment could be entered on such an award.

Suppose the arbitrators had rejected these accounts against *J. H, R. H,* and *T. C. H.* would their rejection be obligatory on the administrator, and prevent him from suing at law? In short, who were the parties to the suit? *B. H.* and *T. C. H.* surviving partners, against *C. A. W.* administrator of *A. W.* They were the only persons who could be affected by the suit.

What will be the result if your honours confirm this decree? That you reverse a judgment which you have already affirmed in this very case, when you had the same powers to judge, and the same evidence before you, as you now have when sitting as a court of equity.

June, 1797.

Howards
vs.
Warfield's
administrator.

The Court of Appeals, [Rumsey, Ch. J. Mack-all and Jones, J.] at this term, (June 1797,) *Reversed* the decree of the court of chancery, and *dissolved* the perpetual injunction, giving the appellants liberty to proceed at law to compel payment of the judgment recovered against the appellee in the general court, and also the damages and costs assessed in the court of appeals on the affirmance of that judgment. And it was also adjudged &c. that the appellee pay to the appellants the further sum of 34l. 7s 0d current money, adjudged and assessed by the court of appeals for damages for the detention of the said debt by the appellee since the affirmance of the said judgment in the court of appeals. Also that each party pay their respective costs incurred in the court of chancery and in this court.